USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 92-2234 SHERRY ANN SULLIVAN, Plaintiff, Appellant, v. CENTRAL INTELLIGENCE AGENCY, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ _________________________ Before Breyer, Chief Judge, ___________ Selya and Stahl, Circuit Judges. ______________ _________________________ James H. Lesar, with whom David L. Sobel and Mark Zaid were ______________ ______________ _________ on brief, for appellant. Robert M. Loeb, Attorney, Appellate Staff, Civil Division, ______________ U.S. Department of Justice, with whom Stuart M. Gerson, Assistant ________________ Attorney General, Richard S. Cohen, United States Attorney, and ________________ Leonard Schaitman, Attorney, Civil Division, were on brief, for _________________ appellee. _________________________ May 26, 1993 _________________________ SELYA, Circuit Judge. Invoking the Freedom of SELYA, Circuit Judge. _______________ Information Act (FOIA), 5 U.S.C. 552 (1988), plaintiff- appellant Sherry Ann Sullivan requested information from nine federal agencies. Her curiosity unslaked by the meager responses to her request, she sued. The federal district court ordered the agencies to explain their search methodologies in greater detail and reviewed some withheld documents in camera. Finding no FOIA __ ______ violations, the court granted summary judgment in favor of all defendants. Ms. Sullivan appeals with respect only to the Central Intelligence Agency (CIA).1 She limits her argument to the adequacy of the CIA's file search and the applicability of the President John F. Kennedy Assassination Records Collection Act of 1992 (JFK Act), Pub. L. No. 102-526, 106 Stat. 3443 (1992). After "indulging all reasonable inferences in [appellant's] favor," Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990), ___________ _____ as the summary judgment standard necessitates, we affirm. I. A POSSIBLE MISSION I. A POSSIBLE MISSION Appellant's father, Geoffrey Sullivan, and his quondam colleague, Alexander Rorke, were last seen on September 24, 1963, leaving Cozemel, Mexico in a twin-engine Beechcraft airplane. Though the pair filed a flight plan for Tegucigalpa, Honduras, they never arrived. A search ensued, but neither the aircraft nor its occupants were found. ____________________ 1In view of this limitation, we omit any reference to the other eight agencies in the pages that follow. 2 In later years, appellant grew determined to solve the mystery of her father's disappearance. On the basis of interviews and an inspection of declassified government documents, appellant surmised that Rorke and her father were engaged in a CIA-sponsored mission to drop propaganda (or perhaps something more sinister) over Cuba. Despite appellant's suspicions, the CIA steadfastly refused to acknowledge that it employed either man at any time. Undaunted, appellant requested that the CIA provide her with documents about the missing men. The agency perused its non-operational files, finding no data about Geoffrey Sullivan and a few, apparently inconsequential, documents relating to Rorke. When the agency balked at searching its operational files, appellant instituted the instant action. II. THE FOIA CLAIM II. THE FOIA CLAIM We begin by exploring the intersection between FOIA and the CIA Information Act of 1984, 50 U.S.C. 431-432 (1988). We then apply the statutory framework to the case at bar. A. Statutory Structure. A. Statutory Structure. ___________________ In general, FOIA requires that upon due inquiry every federal agency "shall make [requested] records promptly available to any person." 5 U.S.C. 552(a)(3). This broad command is hedged by nine exemptions. See 5 U.S.C. 552(b). Although ___ these exemptions cover much of what typically might be found in 3 CIA operational files,2 FOIA does not give the CIA carte blanche to refrain from producing documents merely because it is an intelligence agency. Consequently, the CIA had to divert trained intelligence officers to search its entire file system in response to FOIA requests, notwithstanding the relatively limited number of non-exempt documents likely to be culled. See S. Rep. ___ No. 305, 98th Cong., 1st Sess. 6-7 (1983). To curb the inefficiencies inherent in applying standard FOIA requirements to the arcane realm of the CIA, Congress, acting pursuant to its reserved power to insert additional FOIA exemptions in other statutory enactments, see 5 U.S.C. 552(b)(3); see also CIA v. ___ ___ ____ ___ Sims, 471 U.S. 159, 167-68 (1985) (acknowledging that the CIA ____ Information Act creates FOIA exemptions); Maynard v. CIA, 986 _______ ___ F.2d 547, 555 (1st Cir. 1993) (similar), passed the CIA Information Act. The Information Act addressed the problem by excusing the CIA from searching its operational files in response to most FOIA requests. Operational files, i.e., files that memorialize ____ the conduct and means of the government's foreign intelligence and counterintelligence efforts, see 50 U.S.C. 431(b), are the ___ most sensitive of the CIA's records and, thus, the most likely to need an extra measure of protection. Recognizing, however, that operational files can be highly informative, Congress carefully ____________________ 2For example, FOIA does not require production of classified national defense and foreign policy documents, 5 U.S.C. 552(b)(1), trade secrets or other confidential commercial information, 5 U.S.C. 552(b)(4), or law enforcement investigatory files, 5 U.S.C. 552(b)(7). 4 carved out three areas in which requestors, notwithstanding the statutory bar, might nonetheless receive materials. Specifically, the CIA must search such files and produce relevant information if a document request is (1) [from] United States citizens . . . who have requested information on themselves . . . ; [or] (2) [regarding] any special activity the existence of which is not exempt from disclosure under [FOIA]; [or] (3) the specific subject matter of an investigation by the intelligence committees of the Congress, the Intelligence Oversight Board, the Department of Justice, the Office of General Counsel of the [CIA], the Office of Inspector General of the [CIA], or the Office of the Director of Central Intelligence for any impropriety, or violation of law, Executive order, or Presidential directive, in the conduct of any intelligence activity. 50 U.S.C. 431(c). In sum, then, the statutory exceptions are for first-party requests, special activity requests, and requests that focus on investigations of improprieties in intelligence- gathering activities. B. Applying the Exceptions. B. Applying the Exceptions. _______________________ Although appellant asserts that her information request implicates each of the three exceptions quoted above, we think none of them apply in this case. We explain briefly. 1. First-Party Requests. Restricting this aspect of 1. First-Party Requests. ____________________ her appeal to the information she solicits about her father, Ms. Sullivan asseverates that the CIA must search its operational files for responsive documents because section 431(c)(1), 5 properly interpreted, requires the agency, on request, to produce information about the requestor's next-of-kin. We disagree. Appellant arrives at her rather curious reading of the statute by a two-step pavane. She says, first, that the statute is vague as to rights of next-of-kin; and second, that the legislative history resolves the uncertainty in her favor. We find neither step to be consistent with the rhythm of the Information Act. Section 431(c)(1) is anything but murky. The statute's language limits the exclusion to "United States citizens . . . who have requested information on themselves." 50 U.S.C. 431(c)(1). While appellant suggests that, in context, the word "themselves" is ambiguous, we are confident that the word's common meaning "those identical ones that are they," Webster's _________ Third New International Dictionary 2370 (1986) is not only ___________________________________ palpably plain but is also anathematic to appellant's rendition of the exception. The lack of ambiguity entirely undermines Ms. Sullivan's position. Courts will only look behind statutory language in the rare case where a literal reading must be shunned because it would produce an absurd outcome, see, e.g., Public ___ ____ ______ Citizen v. United States Dep't of Justice, 109 S. Ct. 2558, 2566 _______ _______________________________ (1989) ("Where the literal reading of a statutory term would compel an odd result, [courts] must search for other evidence of congressional intent . . . .") (citation and internal quotation marks omitted), or when the legislature has otherwise blown an uncertain trumpet. See Morales v. Trans World Airlines, Inc., ___ _______ ___________________________ 6 112 S. Ct. 2031, 2036 (1992); FMC Corp. v. Holliday, 111 S. Ct. __________ ________ 403, 407 (1990); see also United States v. Aversa, 984 F.2d 493, ___ ____ _____________ ______ 499 n.8 (1st Cir. 1993) (en banc) (reiterating that where statute is clear, further hermeneutics are unnecessary) (collecting cases). Here, reading the statute literally produces a perfectly plausible result and the clarity of the statutory command is stunning. That ends the matter: if Congress had wished to create a right for next-of-kin, it could and, we think, would have done so explicitly. The second step of appellant's section 431(c)(1) pavane is equally bollixed. The legislative history of the Information Act reinforces rather than weakens the unrelievedly narrow construction of the first-party exception that the statutory language portends. See, e.g., S. Rep. No. 305, at 17-18. While ___ ____ some members of Congress apparently believed that the CIA would treat next-of-kin requests "generously," id. at 18, such ___ generosity was obviously meant to be a matter of grace. The Senate Report states unequivocally: "This legislation does not give next-of-kin a right to request information about a deceased person." Id. at 17. The predictions of individual senators to ___ the effect that an agency, once empowered, will act with greater generosity than it is obliged to exhibit cannot serve to overwhelm the letter of the law. We have said enough. Neither the text of section 431(c)(1) nor its legislative history support a right of access to CIA operational files for next-of-kin requestors. Hence, 7 appellant cannot wield the first-party exception as a wedge to loosen the restrictions that safeguard CIA operational files. 2. Special Activity Requests. Appellant's next claim 2. Special Activity Requests. __________________________ is that the CIA must produce the information she seeks because her request relates to a "special activity" within the purview of 50 U.S.C. 431(c)(2). In this instance, the statute's language provides relatively scant guidance, other than to mandate that, in addition to having a special activity linkage, the material must not otherwise be exempt from disclosure under FOIA. See id. ___ ___ The statute is silent in a critical respect; neither its text nor its structure afford a meaningful insight into what characteristics of a CIA activity make it "special." We turn, therefore, to the legislative history. See, e.g., Greenwood ___ ____ _________ Trust Co. v. Massachusetts, 971 F.2d 818, 824 (1st Cir. 1992) _________ _____________ (discussing preferred approaches to statutory construction where a statute's text leaves unanswered questions), cert. denied, 113 _____ ______ S. Ct. 974 (1993). House and Senate reports make clear that Congress designed the special activity exception to allow public access to declassified information while still permitting the CIA to refuse to confirm or deny the existence of documents relating to classified covert operations. See H.R. Rep. No. 726, 98th Cong., ___ 2d Sess. 27 (1984); S. Rep. No. 305, at 24. To accommodate these competing objectives, the special activity provision must be construed in light of two basic concerns: specificity and secrecy. 8 As to the specificity prong, a requestor must identify a particular CIA activity in connection with his or her request. __________ The House report accompanying the Information Act tells us that the term "special activity" means any activity of the United States Government, other than an activity intended solely for obtaining necessary intelligence, which is planned and executed so that the role of the United States is not apparent or acknowledged publicly, and functions in support of any such activity, but not including diplomatic activities. H.R. Rep. No. 726, at 28. The Senate added content to this explanation by furnishing examples. Thus, requests must relate to "a specific covert action operation, such as the Bay of Pigs invasion or the CIA's role in replacement of the Guatemala regime in the 1950s . . . ." S. Rep. No. 305, at 24-25. By contrast, a request is insufficiently specific "if it refers to a broad category or type of covert action operations." Id. at 25. As an ___ example of an inadequately particularized request, the Senate report mentions one that is "predicated on declassification of the existence of CIA covert efforts to counter Soviet influence in Western Europe during the 1950s . . . ." Id. ___ Appellant argues on appeal that the information she seeks is part and parcel of a particular "special activity": the CIA's unremitting efforts to overthrow Cuban President Fidel Castro. Although the parties dispute whether appellant espoused this theory before the district court, we need not resolve the question of waiver because it is apparent that, even in its present incarnation, appellant's theory is unavailing: it rests 9 on CIA activity that is too expansively described to slip within the integument of section 431(c)(2). In an effort to prove the contrary, appellant seizes on an example limned in the Senate report and proclaims that the coup deposing Guatemalan President Arbenz in 1954 is a fair congener to the special activity she has described. We think not. While equating the two might produce a certain superficial symmetry, doing so flies in the teeth of history. There is an essential difference in the magnitude and scope of the anti- Arbenz and anti-Castro campaigns. President Arbenz fled his country at the conclusion of a CIA-inspired operation that lasted only a few months and involved only a handful of agents. See ___ Jeremiah O'Leary, Tricks of the Coup Trade, Wash. Times, Dec. 19, ________________________ 1989, at F3; see generally Julius Pratt, A History of United ___ _________ ____________________ States Foreign Policy 532-33 (1965). Like the Bay of Pigs, the _____________________ overthrow of the Guatemalan government was a discrete operation with a beginning, an end, and a circumscribed middle. In contrast, the CIA's campaign against Castro has been ongoing for decades. By all accounts, it has involved widespread efforts and hordes of people. Indeed, the CIA's role in respect to Castro's Cuba is more properly analogous to CIA operations against Soviet influence in Western Europe during the 1950s, a course of conduct which the Senate specifically indicated was too sweeping to trigger the special activity exception, than to the coup in Guatemala. We turn now to the second prong: secrecy. The special 10 activity provision also requires that the requested material not be exempt from disclosure under FOIA. At the very least, this means that the data must be either unclassified or declassified. See 5 U.S.C. 552(b)(1)(B) (establishing FOIA exemption for ___ classified materials). Declassification occurs only when "an authorized Executive Branch official has officially and publicly acknowledged the existence . . . of a specific special activity." S. Rep. No. 305, at 24; see also Hunt v. CIA, 981 F.2d 1116, 1121 ___ ____ ____ ___ (9th Cir. 1992) (recognizing that the CIA need not release any information on special activities that remain classified). Appellant's request fails this prong of the section 431(c)(2) test because the activity about which she inquires is not generally declassified. The mere fact that the CIA acknowledges involvement in an incident or, more broadly, in a particular region of the world, does not justify the release of documents which touch, however distantly, on that incident or region. Of course, certain aspects of the CIA's efforts to destabilize the Castro regime are in the public domain (the Bay of Pigs, for one). Nonetheless appellant's initial FOIA request apparently did not seek information related to the subjects' participation in any specific (declassified) operations,3 but simply inquired about the two men whose alleged role in CIA affairs has never been acknowledged by either the CIA or any ____________________ 3We are frank to acknowledge that the appellate record is not entirely pellucid in this regard. Appellant, however, must bear the onus of such shortcomings in the record. See ___ Massachusetts v. Secretary of Agric., 984 F.2d 514, 523 n.7 (1st _____________ ___________________ Cir. 1993). 11 Executive Branch official and the circumstances of their disappearance. In this case, such a level of generality is necessarily fatal. With respect to CIA operations, "it is one thing . . . to speculate or guess that a thing may be so . . . ; it is quite another thing for one in a position to know of it officially to say that it is so." Fitzgibbon v. CIA, 911 F.2d __________ ___ 755, 765 (D.C. Cir. 1990) (quoting Alfred A. Knopf, Inc. v. _______________________ Colby, 509 F.2d 1362, 1370 (4th Cir.), cert. denied, 421 U.S. 992 _____ _____ ______ (1975)). That some operations against Cuba have been ____ declassified is insufficient to throw open all CIA files ___ regarding Cuba. At bottom, the interleaved fact that appellant did not initially identify (i) a particular operation against the Castro regime that (ii) is declassified and in which she believed her father participated, defeats her effort to invoke section 431(c)(2). 3. Investigatory Requests. Finally, appellant hawks 3. Investigatory Requests. _______________________ the notion that because a Senate Select Committee (the Church Committee) inquired into certain covert operations against Cuba mounted by the CIA and other (putatively independent) anti-Castro groups,4 the information she requests comprises "the specific subject matter of an investigation by [an] intelligence committee[] of the Congress . . . for any impropriety, or ____________________ 4The Church Committee eventually filed a compendious report of its investigation. See The Investigation of the Assassination ___ ______________________________________ of President John F. Kennedy: Performance of the Intelligence _________________________________________________________________ Agencies, S. Rep. No. 755, 94th Cong., 2d Sess. (1976). ________ 12 violation of law . . . in the conduct of an intelligence activity." 50 U.S.C. 431(c)(3). In our view, appellant's FOIA request does not fall within the exception's province. As the statute's language and legislative history make clear, see id.; see also H.R. Rep. No. 726, at 28-31, a ___ ___ ___ ____ congressional investigation that touches on CIA conduct in a particular incident or region, standing alone, is not sufficient to warrant the release of all CIA documents anent that incident or region. Instead, the congressional investigation and the documents sought must specifically relate to CIA wrongdoing, that is, some "impropriety" or "violation of law" in the conduct of the designated intelligence activity. 50 U.S.C. 431(c)(3). The primary mission of the Church Committee, as appellant admits, was to examine the relationship, if any, between the assassination of President Kennedy, on the one hand, and American-sponsored operations against Cuba, on the second hand. In the course of its work, the Committee considered American operations against Castro and, inevitably, their legality. Seen from that perspective, the Committee's mission does not fit within the contours of section 431(c)(3) for two reasons. First, the Committee's inquiry was not a direct investigation into CIA wrongdoing. Second, appellant's request for information about her father's disappearance bears no claimed or readily discernible relationship to the investigation's purposes. This latter obstacle is insurmountable: a pivotal requirement of section 431(c)(3) is that, to be extractable, the information 13 requested must concern the specific subject matter of the official investigation. Thus, although there were instances in which the Committee searched for agency misconduct, that happenstance does not allow appellant to catapult herself over the statutory parapet. It is simply not enough that information which bore in some remote way on the request surfaced in the course of an official investigation. See H.R. Rep. No. 726, at ___ 30-31. Appellant also points hopefully, albeit without developed argumentation, to the work of the House Select Committee on Assassinations (HSCA). This committee probed whether the CIA might have played a role in the death of President Kennedy, see H.R. Rep. No. 1828, 95th Cong., 2d Sess. ___ (1979), concluding that it did not. Id. at 3. Assuming arguendo ___ ________ that the HSCA investigation centered on potential CIA wrongdoing, its work still cannot serve as a vehicle for bringing appellant's request within the statutory exception. Appellant is not seeking information on the CIA's role in the Kennedy assassination and has not alleged that either her father or Rorke was directly involved in any such machinations. Hence, because her request does not overlap the "specific subject matter of [the] investigation," 50 U.S.C. 431(c)(3), she cannot use the HSCA report as a means to escape the strictures of the Information Act. We rule, therefore, that neither the Church Committee's investigation nor HSCA's probe is sufficiently sturdy a bootstrap 14 to lift appellant's FOIA request over the hurdles erected by the congressional investigation exception to the Information Act.5 III. THE JFK ACT CLAIM III. THE JFK ACT CLAIM After the district court entered summary judgment, but before appellant briefed this appeal, Congress passed the JFK Act, Pub. L. No. 102-526, 106 Stat. 3443 (1992). The Act requires that records related to President Kennedy's assassination be transferred to the National Archives where they are to be made publicly available, subject to certain stipulated conditions. Id. 5. The Act constructs a process distinct ___ from FOIA by which the public can search those documents in an almost unfettered fashion. See id. 4. In a peroration that ___ ___ sheds considerably more heat than light, appellant insinuates that her father's disappearance might be tied in some undefined way to President Kennedy's assassination and implores that we order the district court to review her information request under the new law's disclosure provisions. Her argument is policy- driven; in her view, federal courts should go to great lengths to order documents produced under the JFK Act because the statute instructs agencies to "give priority to . . . the identification, review, and transmission, under the standards of postponement set forth in this Act, of assassination records that on the date of enactment of this Act are the subject of litigation under ____________________ 5Having disposed of appellant's initiative on this ground, we need not consider whether either the Church Committee or HSCA was an "intelligence committee[]" within the meaning of section 431(c)(3). 15 [FOIA]." See id. 5(c)(2)(G). ___ ___ We are unconvinced. The JFK Act, like FOIA, assigns primary responsibility for assessing information requests to the Executive Branch. Judicial review is merely a safeguard against agency action that proves arbitrary, capricious, or contrary to law, not an option of first resort. We can discern no valid reason to throw caution to the winds, disrupt the orderly workings of the statutory scheme, and instruct the district court to dive headlong into uncharted waters. Doing so would be premature from virtually every standpoint: the compilation of records required by the JFK Act has not been completed, appellant has not invoked the administrative processes afforded under the legislation, no agency action has been taken thereunder, and, a _ fortiori, there is no administrative record for a court to mull. ________ See Assassination Archives & Research Ctr. v. U.S. Dep't of ___ ________________________________________ ______________ Justice, F. Supp. , n.3 (D.D.C. 1993) [No. 92-2193; _______ ___ _____ ___ slip op. at 12 n.3] (finding similar JFK Act claim unripe). We need go no further. Appellant has boldly grafted a neoteric JFK Act claim that belongs before the Archivist of the United States onto her FOIA appeal. Since there is no agency action for the district court to review, we decline to participate in so radical an experiment. See JFK Act, 11(c) ___ (providing for judicial review of "final actions" taken by agencies). IV. CONCLUSION IV. CONCLUSION Although we sympathize with appellant's desire to learn 16 the details of her father's fate, she, like all other litigants, must abide by the rules. Congress crafted the CIA Information Act to strike a balance between public disclosure and an effective intelligence apparatus. Our role is not to reassess the relative interests, see Sims, 471 U.S. at 180, or to yield ___ ____ whenever human sympathies are engaged, but simply to apply the law as Congress wrote it. Given the generality of appellant's request and the stringent standard of confidentiality contained in the Information Act, the district court appropriately granted summary judgment in the government's favor. Further, as we have explained, the freshly minted JFK Act claim provides no principled basis for a remand and, thus, no detour around the ruling below. Affirmed. Affirmed. ________ 17