NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13298

JUDGE ROTENBERG EDUCATIONAL CENTER, INC.,[1] & others[2]  vs.
COMMISSIONER OF THE DEPARTMENT OF DEVELOPMENTAL SERVICES
& another.[3]


Bristol.     May 3, 2023. - September 7, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker,
& Wendlandt, JJ.


Developmentally Disabled Person.  Department of Developmental
     Services.  Probate Court, Revocation of decree, Judicial
     discretion.  Judgment, Relief from judgment.  Practice,
     Civil, Relief from judgment.  Regulation.  Administrative
     Law, Regulations.  Constitutional Law, Separation of
     powers.

---

[1] Formerly known as Behavior Research Institute, Inc.

[2] Leo Soucy, individually and as parent and next friend of
Brendon Soucy; Peter Biscardi, individually and as parent and
next friend of P.J. Biscardi; and both as representatives of the
class of all patients at Judge Rotenberg Educational Center,
Inc. (JRC), their parents, and their guardians.  The former
executive director of JRC was originally listed as a plaintiff
as well.

[3] Commissioner of the Department of Early Education and
Care.  The director of the Office for Children, the predecessor
in interest to the defendants, was originally listed as a
defendant in her ex officio capacity.

Civil action commenced in the Bristol Division of the Probate and Family Court Department on February 28, 1986.

A motion to terminate a consent decree, filed on February 14, 2013, was heard by Katherine A. Field, J.

The Supreme Judicial Court granted an application for direct appellate review.


Timothy J. Casey, Assistant Attorney General (Christine Fimognari, Assistant Attorney General, also present) for the defendants.

Max D. Stern (Joseph M. Cacace, Alexandra H. Deal, & C. Michele Dorsey also present) for Leo Soucy & others.

Michael P. Flammia (Christian B.W. Stephens, Matthew D. Rodgers, & Trevin C. Schmidt also present) for Judge Rotenberg Educational Center, Inc.

Kathryn Rucker, Mona Igram, Steven J. Schwartz, & Richard M. Glassman, for The Arc of Massachusetts & others, amici curiae, submitted a brief.

Felicia H. Ellsworth & Charles C. Kelsh, for American Academy of Pediatrics & others, amici curiae, submitted a brief.


KAFKER, J.  The instant appeal concerns a long-standing controversy over the treatment and welfare of a particularly vulnerable population living within our Commonwealth.  These individuals suffer from severe developmental and intellectual disabilities that, left untreated, cause them to engage in grievous self-harm, maiming, and other life-threatening behaviors.  They reside in small group homes under the care of Judge Rotenberg Educational Center, Inc. (JRC), a facility that employs the use of aversive interventions -- most notably, electric skin shock -- as part of its treatment approach to severe behavioral issues.  JRC, which stands as the sole

facility in the country to use electric skin shock on the developmentally disabled, currently operates under the protection of a thirty-six year old consent decree. That decree was entered, and has remained in place, after State agencies resorted to pretextual and bad faith regulatory practices to disrupt JRC's operations in the 1980s and 1990s. The State agencies that remain bound by the decree have since moved for its termination. That motion was denied by a judge in the Probate and Family Court (Probate Court), and the matter now comes before us on appeal.

For many mental health advocates, the controversial interventions used by JRC sound reminiscent of the institutionalization and abuse inflicted on the developmentally disabled in decades past. Yet the families of these clients claim that JRC has been singularly effective in preventing their children from engaging in severely self-injurious and destructive behaviors, such as gouging their own eyes, puncturing their own bodily orifices, and violently attacking others. These families characterize JRC's methods as a treatment of last resort -- one sought after alternative treatments either failed to protect their children from self-harm or left them continually sedated and restrained. This case thus involves a heart-wrenching issue: continue to protect a controversial practice that has widely been criticized, or pave

the way for its prohibition at the risk of subjecting these vulnerable patients to a life of sedation and restraint, or extreme self-injury.

The propriety of this controversial treatment does not reach us in a vacuum, however. The record before us contains extensive findings of fact made by the judge below, based on a forty-four day evidentiary hearing that closed in 2016, with 788 exhibits and nearly thirty witnesses. Among those findings was the judge's conclusion that the Commonwealth had yet again resorted to bad faith regulation of JRC in 2010, and that, as of 2016, the medical community remained divided as to whether JRC's treatment approach fell outside the professional standard of care for the most severely disabled patients.

It is particularly troubling that the case is before us on an evidentiary record that closed seven years ago, especially given the fact-intensive nature of the issues at stake. Nonetheless, because the parties have urged us to decide this appeal without remanding for additional findings, we assess the parties' arguments on the record we have been given. That record compels us to conclude that the defendants have failed to demonstrate that the judge's findings were clearly erroneous, based on the evidence before her in 2016.

We stress, however, that our conclusion does not foreclose the possibility that new developments will occur, or have

occurred, bearing on these factual issues. Moreover, nothing in our decision or the consent decree prevents the Department of Developmental Services (department) from exercising its existing authority to contest the use of electric skin shock on individual JRC patients at their yearly substituted judgment hearings in the Probate Court. Nor is the department precluded from enforcing the consent decree's requirement that electric skin shock be used only where it is the least intrusive, most appropriate treatment. The fact that the department has largely chosen not to do so informs the context within which we rule on this issue. That being said, today we decide only the narrow question of whether the judge below abused her discretion in concluding that the department failed to establish that the consent decree should be terminated based on the evidentiary record before the Probate Court in 2016. We conclude that she did not, and thus affirm the denial of the defendants' motion.[4]

---

[4] We acknowledge the amicus brief submitted by the American Academy of Pediatrics, the American Association on Intellectual and Developmental Disabilities, the National Association of State Directors of Developmental Disabilities Services, the National Association of State Directors of Special Education, the International Association for the Scientific Study of Intellectual and Developmental Disabilities, the National Association for the Dually Diagnosed, and the Massachusetts Chapter of the American Academy of Pediatrics, as well as the amicus brief submitted by The Arc of Massachusetts, the Disability Policy Consortium, the Massachusetts Developmental Disability Council, the Federation for Children with Special Needs, and MassFamilies. In addition, we allow the plaintiffs' joint motion for leave to respond to the briefs of the amici

1.  Background.  We summarize the relevant factual findings of the judge below, supplemented where necessary by undisputed evidence in the record.  See Connor v. Benedict, 481 Mass. 567, 568 (2019).  Because the record before the Probate Court closed in 2016, any references to "current" practices, procedures, or statistics is only current as to that date, unless otherwise noted.

a.  JRC and its treatment methods.  Since 1975, JRC[5] has operated a residential program in the Commonwealth to provide treatment and educational services for individuals with intellectual disabilities, developmental disabilities, and behavior disorders.  At present, JRC operates forty-four houses in the Commonwealth, where clients live in a residential setting.  The judge below credited testimony that patients are housed in a very humane environment and the staff is well trained.  As of March 2015, the total number of clients enrolled at JRC was 244.

Many of the developmentally disabled patients at JRC suffer from severely problematic behaviors, including aggressive,

---

curiae.  See Mass. R. A. P. 17 (b), as appearing in 481 Mass. 1635 (2019).

[5] At the time of its founding, JRC was known as Behavior Research Institute, Inc.  See note 1, supra.  For the sake of consistency, we shall refer to the facility as JRC throughout this decision.

destructive, and self-injurious behaviors.  Indeed, a number of patients have come to JRC after being expelled from other facilities unable to address the severity of their behavioral issues.  For some of these patients, prior programs had resorted to restraint or heavy sedation in an attempt to manage their harmful behaviors.  Because JRC generally does not turn patients away, for numerous families, JRC was the only program willing to accept their son or daughter.

Unlike other facilities, JRC has a policy of avoiding or minimizing the use of psychotropic medication to treat its patients.  Instead, JRC has long relied upon applied behavior analysis (ABA) to treat patients.  This involves conducting a "functional behavior assessment," i.e., studying the relationship between problematic behaviors and the conditions that precede them.  JRC then uses positive reinforcement, e.g., rewards, to encourage desirable behaviors and negative consequences, or "aversives," to discourage undesirable behaviors.  Typically, JRC relies in the first instance on positive reinforcement procedures alone.  However, if JRC's positive programming fails to accomplish a patient's treatment goals, or if it does not effectively treat the patient's problematic behavior, the family is given the option of including aversives as part of their son or daughter's treatment plan.  At the evidentiary hearing, several former JRC patients

and parents credited JRC's aversive treatments with significantly improving these patients' problematic behaviors.

At the time this litigation first began in 1986, JRC employed a variety of physical aversives in a hierarchical fashion with increasing levels of intrusiveness.  See Natrona County Sch. Dist. No. 1 v. McKnight, 764 P.2d 1039, 1045 n.4 (Wyo. 1988) (listing hierarchy of aversives utilized at JRC in 1985).  In the years after the consent decree was entered, JRC shifted away from this existing hierarchy of aversives in favor of using the "Graduated Electronic Decelerator" (GED), a device that administers a two-second electric shock to the surface of the skin, usually on the arm or the leg.  At present, the GED is the primary physical aversive used at JRC.  JRC utilizes two versions of the device:  the GED-3A and the GED-4.  The former delivers a current of 15.25 milliamps, and the latter delivers a current of 41 milliamps.

JRC administers the GED to discourage specific problematic behaviors.  When a JRC staff member observes one of these behaviors, a second staff member verifies that the behavior is one for which use of the GED has been authorized pursuant to a substituted judgment action, see note 6, infra, and the first staff member then activates the GED.  Normal application of the device results in transient pain.

Before a patient may be treated with the GED, a JRC clinician must first develop a treatment plan. Each plan is reviewed and approved by JRC clinicians, as well as a human rights committee and a peer review committee. After JRC develops the treatment plan, it must petition the Probate Court for substituted judgment[6] authorization to use the GED on that patient. Once the Probate Court has approved the plan, JRC must petition for reauthorization on an annual basis to continue treating the patient with the GED. In the treatment plan provided to the Probate Court, JRC is required to identify the behaviors that it intends to target with the GED, and a JRC clinician must aver that the GED is the least intrusive, most effective treatment for the patient in question. The department has the ability to oppose the use of the GED on a particular patient at these yearly substituted judgment proceedings, but, in practice, the department rarely does so. In one 2014 proceeding where the department did choose to participate, the

---

[6] Substituted judgment proceedings are used as a "means by which incompetents may exercise their right to refuse or terminate treatment. . . . The judge, after hearing, must try to identify the choice which would be made by the incompetent person, if that person were competent, taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person" (quotation and citation omitted). Guardianship of Doe, 411 Mass. 512, 518 (1992).

Probate Court ultimately sided with the department and declined to authorize the use of the GED on that patient.

As of 2014, thirty percent of JRC's patients had treatment plans that included the use of court-authorized aversives.  The remaining seventy percent were treated using positive programming alone.  As of the close of evidence in 2016, few JRC patients treated with the GED were minors.  Counsel for the defendants has since represented to this court that there are currently no children receiving the GED as part of their treatment plan.

b.  History of current litigation.  The procedural history of this litigation began almost forty years ago, and the matter last came before this court in 1997.  See Judge Rotenberg Educ. Ctr., Inc. v. Commissioner of the Dep't of Mental Retardation (No. 1), 424 Mass. 430 (JRC I), S.C., 424 Mass. 471, 424 Mass. 473, and 424 Mass. 476 (1997).  We need not repeat the entire history of this case, much of which is covered in our prior decision.  See id. at 433-442.  In short, this litigation began after the Office for Children (OFC) issued a set of emergency orders in 1985 requiring JRC to immediately cease the use of physical aversive treatments and to halt the intake of new patients.[7]  A judge in the Probate Court would later find that

_____

[7] Because JRC provided treatment to children with special needs, in a full-time residential setting, it was at that time

OFC had issued these orders "based upon no medical foundation," and that OFC attempted to hide this fact by retroactively altering a report that had been "laudatory to [JRC] in all substantial respects."

In response to the emergency orders, JRC and a class consisting of all JRC patients and their parents and guardians filed suit, alleging various constitutional and civil rights violations. Thereafter, a judge in the Probate Court entered a preliminary injunction enjoining OFC from enforcing its orders and found that OFC had engaged in bad faith regulation of JRC. The parties subsequently reached a settlement agreement, and on January 7, 1987, the Probate Court approved and incorporated the agreement as an order of the Probate Court (consent decree). As part of the settlement agreement, licensing responsibility for JRC was transferred from OFC to the Department of Mental Health; later, that responsibility was transferred to the Department of Developmental Services.[8]

---

required to obtain a license from the Office for Children (OFC). See G. L. c. 28A, §§ 9, 11, as amended through St. 1981, c. 726, § 1. OFC is now known as the Department of Early Education and Care (DEEC). See Commonwealth v. Power, 76 Mass. App. Ct. 398, 400 n.2 (2010). DEEC is the other named defendant in this appeal.

[8] At the time that the Department of Developmental Services (department) became a party to the case, it was known as the Department of Mental Retardation. See G. L. c. 19B, § 1, as amended through St. 2008, c. 182, § 9.

The consent decree contained a number of provisions, which are discussed at length in JRC I, 424 Mass. at 433 n.5, 443-445, 448, and included a requirement that both parties act in good faith. Another provision required JRC to obtain authorization from the Probate Court, by way of substituted judgment proceedings, before it could employ physical aversives in the individual treatment plan of a client unable to give consent. This was the only provision that was explicitly designed to survive the termination of the consent decree. The decree called for compliance reviews to occur at six-month intervals, with the decree to terminate automatically after the second such review "unless the [Probate] Court, for good cause shown related to the terms or substance of [the settlement] agreement, orders otherwise." The Probate Court subsequently issued an order on July 7, 1988, extending the settlement agreement indefinitely. No party objected to this extension.

Shortly after the consent decree was entered in 1987, regulations were promulgated to govern the appropriate use of physical aversives. The regulations classified aversive interventions into one of three "levels," depending on severity. See 104 Code Mass. Regs. § 20.15(3) (1987). Level three was comprised of the most severe aversive treatments, including any intervention that "involve[d] the contingent application of physical contact aversive stimuli" or "pose[d] a significant

risk of physical or psychological harm to the individual." See 104 Code Mass. Regs. § 20.15(3)(d). Any program seeking to use level three aversives was required to apply for a special certification from the department.[9] See 104 Code Mass. Regs. § 20.15(4)(f) (1987). After conducting a review and inspection of the program, the department would grant, grant with conditions, or deny the program a level three certification for a period not to exceed two years. See 104 Code Mass. Regs. § 20.15(4)(f)(7),(9).

The regulations further specified that a program would only be eligible to receive a certification for the use of level three aversives if, "prior to the effective date of this regulation, . . . the program had been using one or more level III interventions pursuant to a Behavior Modification plan for one or more clients of the program." See 104 Code Mass. Regs. § 20.15(4)(f)(11). Additionally, and in accord with the consent decree, level three interventions could not be used on a patient unable to provide consent, absent authorization from the Probate Court, obtained by way of a substituted judgment proceeding. See 104 Code Mass. Regs. § 20.15(4)(e) (1987). Moreover, these

---

[9] At the time the regulations were first promulgated, the Department of Mental Health was the agency responsible for certifying programs for use of level three aversives. See 104 Code Mass. Regs. §§ 2.02(2), 20.15(4)(f) (1987). This responsibility was subsequently transferred to the Department of Developmental Services.

interventions could only be used "to address extraordinarily difficult or dangerous behavioral problems that significantly interfere with appropriate behavior and or the learning of appropriate and useful skills and that have seriously harmed or are likely to seriously harm the individual or others." See 104 Code Mass. Regs. § 20.15(4)(b)(5) (1987). JRC is the only program in the Commonwealth certified to use level three aversives.[10]

In 1993, six years after the consent decree was entered, the department launched a campaign to "disrupt the operations of JRC by every conceivable means," with the intent of putting JRC out of business. See JRC I, 424 Mass. at 454. This included "interfering with JRC's relationships with funding agencies and JRC's fiscal operations," as well as imposing "a severe and essentially constant burden on the JRC staff by having to respond to an unrelenting stream of bad faith regulatory

---

[10] It should be noted, however, that there are references in the record to other facilities that have, at various times, used a level three aversive because they employed time-outs beyond fifteen minutes. See 104 Code Mass. Regs. § 20.15(3)(d)(2) (1987) (defining level three aversives to include time-outs in excess of fifteen minutes). See also Judge Rotenberg Educ. Ctr., Inc. v. Commissioner of the Dep't of Mental Retardation (No. 1), 424 Mass. 430, 447 n.20 (JRC I), S.C., 424 Mass. 471, 424 Mass. 473, and 424 Mass. 476 (1997) (noting that department had permitted use of aversive therapies on individual patients at various facilities, even though department official conceded that "there is no authority in the regulations for approval of Level III procedures 'in the absence of a certification as a program'").

demands" made without justification. Id. at 456-457. At one point, the department ordered JRC to discontinue level three aversives for six patients, and later, it decertified JRC as a provider of level three aversives altogether. The department's actions led JRC to file a complaint alleging that the department was in contempt of the consent decree.

After a thirteen-day trial, a judge in the Probate Court found that the department had engaged in bad faith regulation of JRC, held the department in contempt of the consent decree, and placed it in receivership to oversee and manage its interactions with JRC. This court affirmed the finding of contempt on appeal, but narrowed the scope of the receivership. See id. at 463, 466-467. In 2003, the parties agreed to a winding down of the receivership. By order of the Probate Court, the receivership came to an end in 2006, thereby restoring the department's regulatory oversight of JRC. The order did not, however, terminate the consent decree.

c. Department's regulatory conduct postreceivership. In August 2007, a former JRC resident called the facility, impersonated a staff member over the telephone, and ordered JRC employees to administer dozens of electric shocks to two patients in the middle of the night. The caller also ordered the employees to place a third patient on a four-point restraint

board, despite the fact that this was not authorized by the patient's treatment plan.

In the wake of the incident, JRC was investigated by the department, along with a number of other entities, including the Department of Social Services, the Department of Early Education and Care, the Disabled Persons Protection Commission, and an independent monitor. These investigations identified a number of issues that contributed to this horrible incident, and the department issued an action plan to JRC in early 2008 requiring the facility to, inter alia, ensure that staff personally witness the targeted behavior before using the GED, and minimize the time between observing the behavior and administering the GED.

In January 2008, the Secretary of the Executive Office of Health and Human Services (EOHHS), JudyAnn Bigby, sent a memorandum to Governor Deval Patrick with recommendations for ways in which the administration could "change the State's policy toward JRC without running afoul of the [consent decree]." Bigby made clear that she was "personally outraged by the continued practice of electric skin shock therapy" and believed it to be outside the current standard of care. She tasked EOHHS Assistant Secretary Jean McGuire with forming and leading a clinical advisory group on the use of aversives. The initiative resulted in a memorandum authored by one of its

members, Dr. Charles Hamad (Hamad memo or memo), a psychologist at University of Massachusetts Medical School (UMass Medical).

Upon receiving Hamad's draft of the memo, McGuire suggested a number of edits, including the minimization of one expert's opinion that she felt "looked like a rationale for keeping one place [that uses electric skin shock] open in the country (which would be the one we already have)." Hamad approved McGuire's edits, which included a new sentence stating, "In brief, our conclusion is that neither the professional literature nor the practice arena supports the use of aversive contingent interventions for behavior management of people with intellectual or other disabilities that may involve serious behavioral problems." The final version of the Hamad memo was attached to a subsequent policy review memorandum that McGuire drafted and sent to Bigby in December 2008, which listed various political and regulatory options for changing the administration's policy toward the use of electric skin shock.

One year later, Bigby sent a memorandum to the Governor with an update on the status of JRC since the August 2007 incident. She noted that there had been "considerable improvement in Executive agency collaboration and oversight of JRC, which in turn has led to noteworthy progress in JRC's performance." She also stated that the department's level three "certification team has recently completed a monitoring review

and found JRC to be in substantial compliance with previously imposed conditions." Although Bigby reiterated her belief that the use of aversives "does not reflect the community standard of care or best practices," she concluded that, "at least for now," the administration should "continue the current close monitoring and regulation of JRC and . . . not pursue any other options at this time."

In May 2010, the Governor's chief legal counsel met with representatives of advocacy groups opposed to aversive treatments. McGuire subsequently informed the department of the issues discussed at the meeting, including the advocates' recommendation that the department "make every use of the upcoming certification to assure that we are tough on / responsive to those areas where he [sic] continues to be non-compliant or has slipped."

The following month, the department's 2010 certification team, headed by Dr. Philip Levendusky, completed its report on JRC's most recent application for level three certification. The team concluded that JRC was in "substantial compliance" with prior conditions imposed by the department and recommended that JRC be given a one-year recertification to use level three aversives with certain conditions of compliance. However, in a subsequent series of communications between Levendusky, the department's general counsel, and the department's commissioner,

the 2010 report was further revised without consulting the remaining team members. In the course of these revisions, the department's general counsel removed the "substantial compliance" language from the report as well as the recommendation that JRC be issued a one-year certification. The final, revised version of the report instead extended JRC's existing certification by fourteen working days. Within that time, JRC was required to submit a corrective action plan for obtaining compliance with all of the report's conditions, and to submit additional progress reports at forty-five-day intervals.

Following the issuance of this report, and in the course of complying with the deadlines contained therein, JRC exchanged a number of reports and correspondences with the department in which JRC challenged the department's ability to impose certain conditions, and the department rejected various of JRC's assertions of compliance. Eventually, in the summer of 2011, JRC and the department agreed to mediation before the former receiver. The parties ultimately reached an agreement in July 2012 resolving their dispute.

While the mediation was still ongoing, the department amended its behavior modification regulations to prohibit the use of level three aversives, except for "individuals who, as of September 1, 2011, [had] an existing court-approved treatment plan" authorizing their use. See 115 Code Mass. Regs.

§ 5.14(4)(b)(4) (2011).  In effect, these regulations imposed a prospective ban on the use of level three aversives for new JRC patients.  After the regulations went into effect, the department convened a group of experts to serve on an advisory subcommittee charged with promulgating new guidelines for the Statewide implementation of the department's favored treatment approach, Positive Behavior Supports (PBS).[11]  In advance of the subcommittee's discussions of the ABA literature concerning the efficacy and acceptability of using specific procedures to decelerate problematic behaviors, a representative of the department informed the subcommittee co-chair that "it won't matter whats [sic] in the literature if [the commissioner] does not like it."  Some members of the subcommittee nonetheless went on to voice support for the use of level three aversives in certain limited circumstances, and the group expressed discomfort with draft guidelines that would ban specific interventions.  The department subsequently instructed the

---

[11] Positive Behavior Supports (PBS) focuses on the conditions that precede problem behaviors and the environmental changes that can be made to improve a client's quality of life. The judge below found that PBS was more accurately described as a philosophy or general approach to treatment, rather than a subdiscipline within the field of psychology.

subcommittee not to address the issue of level three aversives as part of their work.[12]

d. <u>Procedural history leading to instant appeal</u>. In 2013, while the advisory subcommittee's discussions remained ongoing, the defendants filed a motion in the Probate Court to terminate[13] the consent decree, pursuant to Rule 60 of the Rules of the Probate Court (2013) and Mass. R. Civ. P. 60 (b) (5), 365 Mass. 828 (1974). The department argued that termination of the decree was warranted because the department had long since abandoned its history of bad faith regulation, and because the

---

[12] The department went on to amend its regulations that year to remove certain level two aversives, including procedures requiring significant physical exercise, unpleasant sensory stimuli like loud noises or bad tastes, and meal delays. See 115 Code Mass. Regs. § 5.14(3)(c)(1) (2013). However, it was not until 2020 that new regulations went into effect replacing the existing regulations governing behavior modification with a PBS framework. See 115 Code Mass. Regs. §§ 5.14, 5.14A (2020).

[13] The parties have characterized the defendants' pleading as a motion to "vacate" the consent decree. However, the defendants' motion "did not challenge the grounds on which [the consent decree] was earlier entered," but "sought only to prevent its prospective application." <u>MacDonald</u> v. <u>Caruso</u>, 467 Mass. 382, 384 n.4 (2014). Accordingly, the motion is most appropriately understood as a request to terminate, rather than vacate, the decree. See <u>id</u>. See also <u>Inmates of Suffolk County Jail</u> v. <u>Rouse</u>, 129 F.3d 649, 662 (1st Cir. 1997), cert. denied, 524 U.S. 951 (1998) ("While terminating a consent decree strips it of future potency, the decree's past puissance is preserved and certain of its collateral effects may endure. Vacating a consent decree, however, wipes the slate clean, not only rendering the decree sterile for future purposes, but also eviscerating any collateral effects and, indeed, casting a shadow on past actions taken under the decree's imprimatur").

primary physical aversive used by the facility, electric skin shock, was outside the professional standard of care.

A judge in the Probate Court held an evidentiary hearing on the motion, which took place over the course of forty-four days between October 2015 and October 2016. On June 20, 2018, the judge issued a written memorandum of decision denying the motion. The judge found that the department had engaged in bad faith regulation of JRC in 2010, just as it had in prior decades. On this basis, the judge concluded that, as of 2018, the consent decree remained necessary to protect JRC from bad faith conduct such as had occurred eight years prior. The judge's 2018 decision also concluded that the department had failed to demonstrate a significant change in circumstances that would warrant termination of the consent decree. In reaching this conclusion, the judge found that the department had failed to show that, as of the close of evidence in 2016, there was a professional consensus that level three aversives were outside the standard of care. The defendants timely filed a notice of appeal, and the case was entered in the Appeals Court in August

2021.[14]  Thereafter, this court granted the parties' joint application for direct appellate review.[15]

2.  Standard of review.  Rule 60 (b) (5) permits the court to grant relief from a judgment with prospective effect where "it is no longer equitable" for the judgment to remain in place. This requires the moving party to demonstrate a significant change in circumstances since the entry of the judgment that would warrant its modification or termination.  See MacDonald v. Caruso, 467 Mass. 382, 388 (2014), and sources cited.  This standard is a flexible one, and its application depends upon the individual facts of the case and the nature of the judgment at issue.  See Rufo v. Inmates of Suffolk County Jail, 502 U.S.

---

[14] The three-year delay between the department's notice of appeal and the entry of this case in the Appeals Court appears to have been due to the size of the record, compounded by delays in receiving searchable copies of the electronic transcript files, as well as lapses in communication between the clerk's office of the Probate and Family Court (Probate Court), the parties, and the stenographers.

[15] JRC has argued that DEEC's appeal should be dismissed because DEEC failed to file a brief after the case had been entered in this court.  DEEC, which joined in the notice of appeal and docketing statement, has since moved to join the department's appellate brief.  DEEC has argued that it failed join the department's brief at the time of filing because counsel for the defendants "mistaken[ly]" believed that DEEC had no further obligations under the decree, given that no children enrolled at JRC are approved for use of level three aversives. JRC has failed to articulate any prejudice that would stem from allowing DEEC's motion to join the department's briefing. Accordingly, we allow DEEC's motion to join the department's brief and decline JRC's invitation to dismiss DEEC's appeal.

367, 380-381 (1992). See also Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, Ltd, 45 F.3d 582, 586 (1st Cir. 1995). Thus, consent decrees that implicate "the supervision of changing conduct or conditions," which "are thus provisional and tentative," are more likely to warrant modification than consent decrees that "give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change." Rufo, supra at 379, quoting from Justice Cardozo's often-cited articulation of the standard in United States v. Swift & Co., 286 U.S. 106, 114-115 (1932).

The decision whether to grant relief from judgment under rule 60 (b) rests within the sound discretion of the trial judge. See Atlanticare Med. Ctr. v. Division of Med. Assistance, 485 Mass. 233, 247 (2020) (Atlanticare). "Accordingly, the denial of a motion under Rule 60 (b) will be set aside only on a clear showing of an abuse of discretion" (quotation and citation omitted). Id. In effect, this means that the decision will be affirmed unless the judge below "made a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (citation omitted). Dacey v. Burgess, 491 Mass. 311, 317 (2023). Here, the department's argument that the judge abused her discretion is focused primarily upon contesting two factual findings derived from the

evidentiary record before the Probate Court in 2016:  (1) the department's continued bad faith regulatory conduct toward JRC; and (2) the absence of a professional consensus whether level three aversives fall outside the accepted standard of care.

"To prevail on appeal on the basis of an assault on a judge's factual findings is no easy matter, for we accept the judge's findings of fact as true unless they are 'clearly erroneous'" (citation omitted).  Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010).  Under this "clearly erroneous" standard, "the judge's findings come here well armed with the buckler and shield" (alteration, quotation, and citation omitted).  JRC I, 424 Mass. at 452.  That is, any finding based partly or wholly on oral testimony will be upheld, unless there is no evidence to support it or the reviewing court "is left with the definite and firm conviction that a mistake has been committed" (citation omitted).  Kendall v. Selvaggio, 413 Mass. 619, 620-621 (1992).  See Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 510 (1997) ("So long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it").  It is not enough that other evidence exists to support a different finding, or even that this court might have weighed the evidence differently in the first instance.  See Brandao v. DoCanto, 80 Mass. App. Ct. 151, 154 (2011).

3.  Timeliness of department's motion.  JRC argues, as a threshold matter, that we need not reach the merits of this appeal because the defendants' motion to terminate the consent decree was untimely.  Although the judge below did not deny the motion on this basis, she observed, in accord with the plaintiffs' argument, that the motion had been filed "long after the existence of both reasons that Defendants proffer" as necessitating termination of the consent decree.

Motions under rule 60 (b) (5) must be filed "within a reasonable time," determined in light of all the circumstances of the case.  Atlanticare, 485 Mass. at 247-248, quoting Mass. R. Civ. P. 60 (b).  In making this determination, "a judge may consider the reasons for delay; the ability of the movant to learn of the grounds earlier; prejudice to the parties, if any; and the important interest of finality" (citation omitted).  Atlanticare, supra at 248.  Where, as here, the judgment at issue binds public officials, the court also considers the governmental and public interests at stake.  See id.  See also Shakman v. Chicago, 426 F.3d 925, 934 (7th Cir. 2005) (under Federal analog, "any consideration of a 'reasonable time' for filing a [Fed. R. Civ. P.] 60(b) motion with respect to the . . . Consent Decree must take into account the nature of that litigation as well as the resulting prejudice, if any, to the present elected officials and the public they represent").  At

bottom, however, "[t]here is no set formula" for determining reasonableness in this context. Atlanticare, supra. Compare id. at 247-249 (seven-year delay did not render motion untimely in "highly unusual circumstances" of case, including conflicting decisions between United States Court of Appeals for First Circuit and this court that would otherwise "lead to confusion and administrative deadlock"), with Owens v. Mukendi, 448 Mass. 66, 76-77 (2006) (listing cases where delays of two or three years rendered motion untimely).

Applying these principles, we find that the department's motion to terminate the decree was timely. The governmental interests are significant, as denial on the grounds of untimeliness "would effectively 'bind all future [regulatory officials]' . . . to the decree's proscriptions," solely because their predecessors failed to bring the motion at the earliest available opportunity. Doe v. Briley, 562 F.3d 777, 781 (6th Cir. 2009), quoting Rufo, 502 U.S. at 392. Additionally, the prejudice to the plaintiffs is comparatively limited. Indeed, any delay inures to the advantage of JRC. As long as the decree remains undisturbed, JRC continues to benefit from the decree's limitation on the regulatory authority that the department may exercise over the facility. Cf. Doe, supra (rejecting argument that motion to terminate decades-old consent decree was untimely where, inter alia, "the only apparent consequence of the delay,

so far as [the nonmovant was] concerned, [was] that the decree remained in place for some [thirty] years longer than it probably should have").

Further, while we recognize that some of the grounds for relief raised in the motion date back to the 1990s, the department's primary arguments -- the department's record of good faith compliance and a new medical consensus -- concern gradual developments. Moreover, given that the department sought to argue that it had a long-standing record of acting in good faith, any delay in raising the argument was a reasonable response to the decree itself; the delay allowed the department time to demonstrate that it had learned from its mistakes and had made the necessary institutional reforms. Cf. Associated Bldrs. & Contrs. v. Michigan Dep't of Labor & Economic Growth, 543 F.3d 275, 279 (6th Cir. 2008), cert. denied, 556 U.S. 1127 (2009) ("An unduly strict reading of the reasonable-time requirement, moreover, would tend to force premature [Fed. R. Civ. P.] 60(b)(5) motions due to a State's fear of losing forever the opportunity to correct an injunction or consent decree"). Accordingly, we turn to the merits of the defendants' motion.

4. Satisfaction of purpose underlying consent decree. Changed circumstances exist to warrant termination of a consent decree, as opposed to its mere modification, where the moving

party demonstrates that the purpose of the decree has been achieved. See 12 Moore's Federal Practice § 60.47[2][c], at 60-178 & n.22 (3d ed. 2023). Although we have not provided specific guidance on how to determine whether the purpose of a consent decree binding public officials has been satisfied, Federal courts have looked to whether the State has demonstrated that it is currently in "substantial, good-faith compliance" with the fundamental purpose of the consent decree and "unlikely . . . [to] return to its former ways." Peery v. Miami, 977 F.3d 1061, 1075 (11th Cir. 2020), quoting Board of Educ. of Okla. City Pub. Sch. v. Dowell, 498 U.S. 237, 247 (1991). See Shakman v. Pritzker, 43 F.4th 723, 728 (7th Cir. 2022) ("A party claiming to have satisfied the terms of a consent decree must show that it has achieved the objectives of that decree . . . and implemented a durable remedy"). To assess whether termination is warranted on that basis, we look first to the underlying purpose of the decree.

    a. Purpose of consent decree. When this case was last before this court on appeal, we explained the context and over-all function of the consent decree as follows:

> "The action that resulted in the settlement agreement was brought because the parents and guardians of JRC patients alleged that OFC was denying individual patients their constitutional rights to certain treatments and was not regulating JRC in good faith. The settlement agreement sought to remedy this situation while allowing the

department to continue to fulfil its statutory duties to regulate mental health facilities."

JRC I, 424 Mass. at 450. In describing the decree, we did not go so far as to state that its purpose was to guarantee the right of access to aversives, as the plaintiffs' claims to that effect were never actually adjudicated and determined by the court. That being said, the terms of the consent decree, along with the underlying proceedings, do reveal two main purposes.

First, the consent decree was intended to ensure that the department's predecessor in interest, OFC (and later, the department itself), would regulate JRC in good faith and avoid engaging in unauthorized, "unilateral interference" with individual treatment plans. Id. at 445-447. Second, the consent decree was intended to permit JRC to continue using aversives on individual patients, but only subject to judicial supervision, by way of substituted judgment proceedings. See id. at 444. The decree contemplated that the department would be allowed to participate in these proceedings, and that JRC would only receive authorization where the proposed treatment was the least intrusive and most appropriate to the client's needs. See id. at 444 n.15. The consent decree otherwise preserved the department's regulatory authority.[16] See id. at

---

[16] We recognize that the consent decree contained a provision calling for a court monitor to evaluate JRC's compliance with department regulations that did not concern

445 ("Indeed, there is no provision in the agreement that provides the department gave up any regulatory authority"). Whether these purposes have been fulfilled remains hotly disputed.  We address each one in turn.[17]

b.  <u>Findings of bad faith regulation</u>.  Here, the judge below found that the purpose of the decree had not been fulfilled because the department engaged in bad faith regulation

_____

level three aversives.  We previously declined to address the permissibility of this provision, stating:

> "We do not consider whether the portion of the agreement providing that it was the court monitor, not the department, that was to oversee compliance with all other applicable State regulations except those related to Level III aversives and undertake general monitoring of JRC's treatment and educational program constituted an impermissible delegation of regulatory authority.  The findings of the judge with respect to this portion of the settlement agreement are not necessary for our decision here; we note, moreover, that neither side disputes that JRC was required to be certified according to the department's regulations, and it is that certification process and its relationship to the settlement agreement that is before us."

<u>JRC I</u>, 424 Mass. at 445 n.19.  Regardless, the winding down and eventual termination of the receivership resulted in these other regulatory functions being returned to the department.

[17] Because the second purpose -- concerning JRC's ability to use aversives pursuant to court authorization -- implicates the interplay between the consent decree and the department's residual regulatory authority, we address it as part of our discussion of the separation of powers argument raised by the defendants.

in 2010.[18]  In support of this finding, the judge relied upon three subsidiary findings:  (1) the alterations made by McGuire to the 2008 Hamad memo concerning the use of aversives; (2) the alterations made by the department's commissioner and general counsel to the 2010 certification report; and (3) the department's decision to accept certain conditions proposed by the 2010 certification team concerning the acceptable use of the GED that the judge concluded were "impermissibl[e] . . . treatment decisions."

On appeal, the department asserts that the Hamad memo did not affect the department's regulation of JRC because the department was not involved in the creation of the memo and did not rely on it in any way.  The department further argues that the changes made to the 2010 certification report were largely nonsubstantive, and that the alterations made were "reasonable exercises of the [c]ommissioner's ultimate authority to approve, approve with conditions, or disapprove a Level III program," citing 115 Code. Mass. Regs. § 5.14(4)(f)(7) (2011).  Finally, the department claims that the conditions in the 2010 certification report concerning the acceptable use of the GED

---

[18] We note that this bad faith finding is based on conduct that occurred thirteen years ago and an evidentiary hearing that concluded in 2016.  We stress again that our analysis does not foreclose the possibility that new developments have occurred since the record closed here bearing on these factual issues.

were properly within the purview of the department's regulatory authority. We conclude that the department's alterations to the 2010 certification report, particularly the removal of the team's substantial compliance finding and the dramatic reduction in certification length, support the judge's finding of bad faith. This finding of bad faith is further supported by the department's unilateral decision, without first assessing the scientific evidence, to impose a regulatory change that would prohibit JRC from using level three aversives on new patients.

"Bad faith is a 'general and somewhat indefinite term' that goes beyond 'bad judgment' or 'negligence,' suggesting 'a dishonest purpose or some moral obliquity,' a 'conscious doing of wrong,' or a 'breach of a known duty through some motive of interest or ill will'" (citation omitted). Buffalo-Water 1, LLC v. Fidelity Real Estate Co., 481 Mass. 13, 25-26 (2018). See JRC I, 424 Mass. at 454. In the context of State action, this includes the use of an otherwise lawful power for an improper purpose. See Pheasant Ridge Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 776 (1987). In effect, bad faith requires an inquiry into the subjective intent behind a party's actions, in addition to the actions themselves. See Bank of Am., N.A. v. Prestige Imports, Inc., 75 Mass. App. Ct. 741, 754-755 (2009), and cases cited (discussing "foundational

definition" of bad faith, which involves "subjective focus" on "knowing and conscious wrongdoing").

i.  Hamad memo.  The judge below found that the Hamad memo, in its final form, "was shaped significantly by [EOHHS] Assistant Secretary McGuire herself and did not represent an independent, objective review."  The judge then cited the Hamad memo in her discussion of bad faith, describing the document as the primary source for a memorandum from McGuire that was "intended to create a justification for [the department] to pursue a path that would eventually end with the elimination of contingent aversive treatment at JRC."  Although we do not discount the Hamad memo, we do not consider it as significant as the judge for the reasons discussed infra.  It does, however, provide further, albeit limited, support for the more compelling evidence of bad faith relating to the department's manipulation of the 2010 certification report.

We recognize, as did the judge below, that McGuire made numerous alterations in the Hamad memo.  This included downplaying one expert's opinion that "contingent electric shock might conceivably be needed . . . for a very, very small number of exceptional cases where the individual's behavior was so extreme as to be life threatening" and adding a statement that "neither the professional literature nor the practice arena supports the use of aversive contingent interventions for

behavior management of people with intellectual or other disabilities that may involve serious behavioral problems." However, McGuire's revisions are largely in accord with the thrust of Hamad's original draft. The original memo contained a list of policy recommendations for consideration by EOHHS, including a recommendation to file legislation banning aversives, which the original memo described as "reflect[ing] a consensus view reached after completion of various review activities conducted under your direction over that [sic] last [six] months." Moreover, both versions of the memo effectively contain the same conclusion that "alternatives to contingent aversive techniques are not only the preferred methods to treat extreme behavior disorders but have clearly become the practice standard in the field of developmental disabilities."

It is nonetheless apparent from the record that the Hamad memo did not provide an independent, objective review of aversives. Notably, Hamad did not seek to interview either of the independent psychologists who evaluate and prepare reports on the patients for whom JRC seeks use of the GED. Nor did Hamad follow up on information he received about clinicians at Johns Hopkins University and the University of Florida, as well as psychologists in Boston, who supported considering aversives where alternative treatments had failed. These shortcomings support the judge's finding that the Hamad memo did not

constitute an independent, objective review of the standard of care.

However, as the department emphasizes, the record does not contain evidence to support the finding that the Hamad memo played a role in the department's subsequent regulatory actions toward JRC. Although the advisory group in which Hamad participated included several department clinicians, it does not appear that department officials were involved in the drafting of the Hamad memo, let alone McGuire's subsequent revisions. Nor was any evidence presented indicating that the department was influenced by, or even aware of, the contents of the Hamad memo at the time of the 2010 certification process. That said, the memo's origin, revisions, and methodology suggest a result-oriented approach that lends some contextual support for the more significant basis for the judge's finding of bad faith: the department's revisions to the 2010 certification team report.

ii. Revisions to 2010 certification team report. Firmer support for the judge's finding of bad faith can be found in the revisions to the 2010 certification team report. The judge found that "many parts of the final report . . . were entirely rewritten" by the department's general counsel and the commissioner, including "significant substantive changes" made without the approval or knowledge of team members other than

Levendusky.  The judge further concluded that even though Levendusky approved the changes, he was not the "driving force" behind them, and that the involvement and influence of the commissioner was akin to the bad faith regulation of the 1980s and 1990s.

Although we agree with the judge's over-all conclusion that these changes support a finding of bad faith, we do not agree that "many" parts of the report were "entirely rewritten."[19]  The important substantive changes to the report, which totaled more than thirty pages, consisted of (1) the deletion of the "substantial compliance" language and the team's recommendation for a one-year recertification; (2) the revised recommendation to extend JRC's existing certification by only fourteen days; and (3) the addition of burdensome documentation requirements, with short turn-around times, contained within the summary of conditions.[20]

It is readily apparent that these three changes were both significant and improper.  The impetus for removing the

---

[19] While language was removed from the "Safety Review of GED and GED-4 Device" section, as well as the "Peer Review" section, and small revisions were made to the "Level II Interventions in Use" section, these edits appear to be more stylistic than substantive.

[20] We also note the alteration of condition (2)(g) from requiring JRC to engage a "multidisciplinary" team to instead requiring an "external" one comprised of at least three clinicians with ABA expertise.

"substantial compliance" language and the one-year certification recommendation both originated from the commissioner and her general counsel, not Levendusky. While Levendusky was the first to suggest adding deadlines, he was not considering changing the one-year certification recommendation at the time the report was drafted, and he did, in fact, find JRC to be in substantial compliance with prior certification conditions. Further, the removal of the "substantial compliance" language was far from mere semantics. The commissioner admitted at the hearing that under the department's own policies, a finding of substantial compliance would have resulted in a one-year certification recommendation, and thus, removal of that language was necessary to justify the department's decision to grant a shorter certification length. Accordingly, the commissioner's decision to extend JRC's existing certification by only fourteen days was improper under the department's own policies, given the 2010 certification team's actual finding of substantial compliance. And by limiting JRC's certification extension to only fourteen days, the department put JRC under significant undue and unjustified pressure, placing all of its patients' aversive treatment plans in jeopardy. Further compounding this pressure was the additional requirement that JRC provide substantial documentation reflecting compliance within relatively tight deadlines.

Considering these improper revisions within their surrounding context, the judge's finding of bad faith in 2010 was not clearly erroneous. Prior to the events in question, Bigby had sent a memorandum to the Governor indicating that the certification team had "recently completed a monitoring review and found JRC to be in substantial compliance with previously imposed conditions," noting that "JRC staff [had] been very cooperative and improvement in the program [was] evident" and that "[b]y all accounts, the situation at JRC [was] as good as it [had] ever been." Things appear to have changed when, four months later, the Governor's chief legal counsel met with disability advocates who recommended "mak[ing] every use of the upcoming certification to assure that [the administration is] tough on / responsive to those areas where [JRC] continues to be non-compliant or has slipped." McGuire relayed this message to the department's commissioner and general counsel, indicating that the Governor's chief legal counsel would expect "an update on this certification process, once the team's work is done but before we issue the decision." McGuire would later remark in an e-mail message that she also told the commissioner that McGuire "did not think [the administration] would support another six month certification." And when the department finally sent the revised certification report to EOHHS, the department's general counsel made a point of highlighting to McGuire that, with the

limited fourteen-day extension, JRC's certification "could be pulled at day [fourteen] or day [forty-five] if [JRC's] response isn't sufficient."  The department's general counsel did so despite acknowledging that, for some of the report's findings of noncompliance, "these are really professional judgment issues."

On the whole, this evidence supports the judge's inference that the removal of the substantial compliance language, the dramatic reduction in certification length from one year to fourteen days, and the imposition of burdensome and time-sensitive follow-up requirements did not amount to a good faith assessment of JRC's regulatory compliance, but an attempt to appease advocates opposed to JRC and maximize the administration's ability to justify a revocation of JRC's certification.  See Lynch v. Crawford, 483 Mass. 631, 644 (2019), quoting Commonwealth v. Casale, 381 Mass. 167, 173 (1980) ("intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial").  This improper motive supports a finding of bad faith.[21]

---

[21] In light of our conclusion that the department's revisions to the 2010 certification report supported the judge's finding of bad faith, we need not address the third basis for the judge's finding of bad faith -- namely, her determination that "by accepting certain recommendations of the 2010 Level III Certification Team, [the department] impermissibly made

c.  <u>Whether purpose of consent decree was satisfied given</u>
<u>passage of time</u>.  We next consider the judge's holding that this
bad faith conduct demonstrated that the purpose of the consent
decree had not been fulfilled as of 2018, and whether that
ruling was an abuse of discretion given the passage of time.
For the reasons discussed <u>infra</u>, we conclude that it was not.
In reaching this conclusion, we recognize that the basis for the
judge's finding of continued bad faith relies heavily on conduct
that occurred in 2010, eight years prior to the denial of the
motion in 2018.  Further, it is apparent that after the parties
mediated their dispute concerning the 2010 recertification
process, the department went on to issue a new one-year
certification, with conditions, to JRC in 2013.  As of the close
of evidence in this case, JRC's 2014 application for
recertification was still outstanding, but as far as we are
aware, there have been no additional allegations of bad faith by
the department in the course of performing its regulatory
oversight duties between 2010 and the commencement of the
hearing in the instant case.  Moreover, it has now been over ten
years since the department's motion to terminate was filed.

---

treatment decisions for JRC clients."  We further note that the
complex interplay between the consent decree and the
department's residual regulatory authority is an issue we
address separately in our discussion of the department's
separation of powers argument.

To be sure, the passage of time, combined with the turnover of administrations and leadership in an agency, as well as the cessation of bad faith regulatory misconduct, can provide support for the eventual termination of a consent decree that binds public officials.  See Frew v. Hawkins, 540 U.S. 431, 441-442 (2004); Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 656-657 (1st Cir. 1997), cert. denied, 524 U.S. 951 (1998).  The Legislature delegates power to an executive agency to make and enforce rules in accordance with that agency's expertise in light of changing conditions.  See Borden, Inc. v. Commissioner of Pub. Health, 388 Mass. 707, 723-724, cert. denied sub nom. Formaldehyde Inst., Inc. v. Frechette, 464 U.S. 936 (1983); Mostyn v. Department of Envtl. Protection, 83 Mass. App. Ct. 788, 797 (2013).  Consent decrees enmesh the judiciary in ongoing oversight of such policy-making decisions, and may serve to "improperly deprive future officials of their designated legislative and executive powers."  Frew, supra at 441.  These risks are compounded for decrees that last decades, requiring ongoing judicial supervision over subsequent actors who are far removed from the original actors' bad faith misconduct.  See Rufo, 502 U.S. at 392 ("To refuse modification of a decree is to bind all future officers of the State, regardless of their view of the necessity of relief from one or more provisions of a decree that might not have been entered had the matter been

litigated to its conclusion"). Thus, to the extent that a consent decree is based on agency misconduct, evidence establishing that the improper conduct of the past has been abandoned, and that the agency has been acting in good faith, would support termination of the consent decree. See Peery, 977 F.3d at 1075. Contrast MacDonald, 467 Mass. at 388-389 (where court order at issue binds private parties, neither passage of time nor movant's ongoing compliance are normally sufficient, without more, to justify termination).

Here, however, the issue of bad faith regulation as of the judge's ruling in 2018 arises not only from the manipulation of documents in 2010 or expert opinion in 2008, but also from the department's continued insistence on using the regulatory process to achieve a predetermined outcome regarding level three aversives -- namely, to eliminate a treatment protocol that the Legislature has repeatedly declined to ban,[22] that judges in the Probate Court have regularly authorized through substituted

---

[22] Although there has been no shortage of legislative proposals to ban aversive treatments, none has passed. See, e.g., 2023 House Doc. No. 180; 2021 House Doc. No. 225; 2019 House Doc. No. 123; 2017 House Doc. No. 93; 2015 House Doc. No. 89; 2015 Senate Doc. No. 80; 2013 House Doc. No. 106; 2013 Senate Doc. No. 30; 2011 Senate Doc. No. 51; 2011 House Doc. No. 77; 2009 House Doc. No. 154. Other proposals to restrict or study aversive treatments have similarly failed. See 2023 House Doc. No. 170; 2022 House Doc. No. 4956; 2015 Senate Doc. No. 79; 2013 Senate Doc. No. 28; 2011 Senate Doc. No. 49; 2009 House Doc. No. 183; 2009 Senate Doc. No. 45.

judgment, and that the department itself had agreed to permit when it chose to bind itself to the consent decree -- without an objective consideration of the evidence concerning the use of the aversives, and without adhering to the legal requirements imposed upon the department by the courts.  In the instant case, we conclude that the judge could reasonably find that the consent decree remained necessary in 2018 to prevent bad faith regulation because the regulations promulgated by the department in 2011 again demonstrated its intention to reach this predetermined outcome without first objectively evaluating the medical evidence or moving to terminate the consent decree.

The record indicates that, in 2010, after recent legislative efforts to ban electric skin shock had failed, Bigby sent a memorandum to the Governor with other policy options to restrict or eliminate electric skin shock.  At that time, she cautioned that a regulatory ban could be construed as bad faith regulation, and recommended tabling any policy proposals until the Attorney General completed a criminal investigation into the August 2007 incident.  After the completion of that investigation, Bigby authored a memorandum in April 2011 with EOHHS's "recommendations for next steps in our regulatory relationship with JRC."  The first recommendation was to move for termination of the consent decree.  The second recommendation, made "alternatively, or concurrently" to the

first, was for the department to promulgate regulations to prospectively ban level three aversives.

Two months later, the department proposed the 2011 regulations. These regulations were proposed only a year after the 2010 certification report, and while the dispute about JRC's compliance with the conditions contained in that report remained ongoing. From the record, it also appears that there was no effort by the department to undertake an independent objective review of level three aversives prior to the passage of these regulations. The department apparently did not convene experts who considered the issue until after the regulations had already gone into effect.

Most importantly, by choosing to pass the 2011 regulations before moving to terminate the consent decree -- which, as explained infra, the department was required to do -- the department effectively sought to use its regulatory power as an "end run" around the consent decree. In so doing, the department again demonstrated that it was determined to alter its policy toward aversives, regardless of the existence of the consent decree and the legal constraints contained therein. It was only later, nearly one and one-half years after those regulations were promulgated, that the department chose to come before the Probate Court to seek termination of the consent decree. All of this supports the judge's conclusion that the

consent decree remained necessary in 2018, despite the passage of time, to preclude bad faith regulation by the department.  We therefore turn to the issue of changed circumstances of fact and the judge's finding that no such change had occurred to warrant termination of the decree.

5.  Existence of changed circumstances of fact.  In entering the consent decree in 1987, the Probate Court found that JRC's use of physical aversives was safe, effective, and professionally acceptable.  At that time, the Probate Court also referenced earlier findings in which the Probate Court had determined that JRC's use of physical aversives was "consistent with professional practice" and was employed "in lieu of antipsychotic medication and other more restrictive procedures, such as seclusion and painful electric-shock."  The department contends that this is no longer the case, both because JRC now employs electric skin shock and because the use of electric skin shock is not within the professional standard of care.  The department also asserts that, regardless of whether electric skin shock falls within the general standard of care, its practical implementation at JRC does not.  We address each contention in turn.

a.  Invention of GED.  Although the judge did not explicitly address whether the invention of the GED constituted a change in circumstances, her failure to do so was not an abuse

of discretion.  While the consent decree predates the use of electric skin shock treatment at JRC, the decree concerns the use of "all aversive procedures which are presently used or which may be proposed for use at [JRC]," apart from exceptions not relevant here.  The consent decree also explicitly states that "[n]othing in this agreement shall preclude [JRC] from developing new . . . aversive procedures."  Given that the consent decree patently contemplated the development of new aversives, the fact that the GED was not in use at that time is clearly insufficient, without more, to warrant termination of the decree.  See Rufo, 502 U.S. at 385 ("modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree").

In reaching this conclusion, we recognize that the findings of fact in support of the consent decree referenced earlier findings in which the Probate Court had determined that JRC's aversive techniques were less restrictive than "painful electric-shock."  That finding was derived from uncontroverted testimony offered at the preliminary injunction hearing in 1986, wherein one of JRC's expert witnesses testified about "contingent electroshock."  Despite JRC's assertion to the contrary, this does appear to be a reference to electric skin shock akin to the GED.  At the 1986 hearing, the expert described "electroshock" as consisting of shocks that "would be

administered for a very, very brief period[,] sometimes, merely seconds," and explicitly distinguished it from electroconvulsive therapy.

Nonetheless, this does not alter our analysis. The same expert -- whose testimony was credited by the Probate Court in 1986 -- stated that contingent electric shock remained "less aversive than . . . large dosages of drugs, [or] . . . electroconvulsive shock therapy." The expert further offered that he would consider using contingent electroshock if a patient was "likely going to kill [him- or herself]" and nothing else had "proved to be effective." Another expert, quoting from professional literature, offered testimony at one of the six-month review hearings in 1987 that "very intense punishment such as shock . . . should be considered for immediate inclusion in treatment" where there is "imminent and extreme physical danger or when the self-injurious behavior is so intrusive as to prevent participation in habilitative and humanizing activities," or when other interventions have not reduced the self-injurious behavior. Accordingly, the invention of an electric skin shock device by JRC does not constitute an unforeseen change in circumstances that would warrant termination of the consent decree.

This is not to say that JRC's turn toward electric skin shock as a physical aversive does not require specific

consideration.  As stated, in entering the consent decree, the Probate Court found that, as of 1987, JRC's use of physical aversives was safe, effective, and professionally acceptable.  A change in the safety, efficacy, or professional acceptability of the physical aversives used by JRC would constitute a significant and unforeseen change in circumstances.  Thus, although the mere invention of the GED, and its use by JRC, is not a change in circumstances, a finding that its usage is not safe or professionally acceptable would be.  With these principles in mind, we turn to the judge's findings as to the standard of care and assess whether those findings were clearly erroneous based on the evidentiary record before the Probate Court in 2016.

b.  <u>Electric shock and standard of care</u>.  In denying the defendants' motion, the judge below found that, as of the close of evidence in 2016, there was still no professional consensus that the use of level three aversives fell outside the standard of care to treat severely self-injurious and violent behavior. The department argues that the judge improperly conflated evidence as to the acceptability of aversive treatments in general with evidence as to the acceptability of electric skin shock in particular.  On the latter subject, the department asserts that the evidence is clear:  there is "no serious dispute" as to the professional consensus that electric skin

shock is outside the standard of care for individuals with developmental disabilities.

We recognize, of course, that a professional consensus does not require unanimity.  In any profession, on the most difficult issues, unanimity of opinion is often nearly impossible to achieve.  See Planned Parenthood Fed'n of Am., Inc. v. Gonzales, 435 F.3d 1163, 1172 (9th Cir. 2006), rev'd sub nom. Gonzales v. Carhart, 550 U.S. 124 (2007) ("By medical consensus, we do not mean unanimity or that no single doctor disagrees, but rather that there is no significant disagreement within the medical community").  That said, our inquiry is limited to whether, based on the evidence before the Probate Court in 2016, the judge's finding that no professional consensus existed at that time as to JRC's use of physical aversives was clearly erroneous.

Our review of the record indicates that there was support for the judge's finding as of the close of evidence in 2016.  In fact, it appears that when the department filed its motion to terminate the decree in early 2013, now a decade ago, there was an ongoing debate about the potential necessity of level three aversives among the very experts that the department elected to consult in formulating practitioner guidelines.  Separate and apart from any clinicians tasked with reviewing JRC's regulatory

compliance or treatment plans,[23] experts that the department selected to serve on its PBS advisory subcommittee expressed ambivalence in 2012 and 2013 about whether electric skin shock was outside the acceptable standard of care.  Indeed, the subcommittee was nearly unanimous[24] in its rejection of draft PBS guidelines on the use of procedures to "decelerate challenging behavior," which included language prohibiting electric skin shock and other level two and three aversives, because members were "uncomfortable with banning specific procedures."  The co-chair of the subcommittee, Dr. Christopher Fox, suggested an alternative set of guidelines that would call for individualized, evidence-based treatments, with rigorous training and monitoring requirements.[25]  Another member of the

---

[23] There was also testimony, which the judge below referenced in her findings, to indicate that the independent clinicians who monitor JRC's regulatory compliance and treatment plans believed that the GED remained within the professional standard of care.

[24] Although the subcommittee co-chair described the subcommittee's opinion as "unanimous" on this issue, he also noted that three members were absent from the portion of the meeting in which the issue was discussed.

[25] In a later e-mail message, Fox went on to acknowledge that the 2011 regulations, which predated the formation of the subcommittee, had already served to limit the use of electric shock to those patients with existing GED treatment plans; he nonetheless opined that, "[i]n an ideal world I would like all interventions to be available," even though "in the world as it exists currently that is not the case."

subcommittee, Dr. Steve Woolf, expressed a similar sentiment, writing:

> "[Level three interventions] should be implemented based on three ethical considerations:  1) client's right to safe and humane treatment, 2) the behavior analyst's responsibility to use the least restrictive procedure, and 3) the client's right to effective treatment.  In my experiences, [there] is a very small minority of clients that may require . . . a level three intervention.  Banning these evidenced-based [sic] positive punishment treatments raises very important ethical concerns when serving clients with chronic life-threatening problem behaviors.  Failing to use these procedures that research has shown to be effective in suppressing self-destructive behavior that have [sic] not responded to positive reinforcement, extinction, or less intrusive intervention is unethical because doing so withholds potentially effective treatment and risks maintaining a dangerous state. . . .

> "I would agree to stronger regulation, oversight, and quality assurance monitoring of these punishment based procedures.  However, the outright prohibition of level three [interventions] requires more time to study."[26]

Other members of the subcommittee similarly expressed concerns that more work was necessary on this issue, with one member stating that "practices regarding the most severely behaviorally challenged individuals requires a much greater degree of collaboration, specification, research and consensus than has been achieved thus far."

---

[26] The department points out that this e-mail message was subject to an evidentiary objection, and the judge admitted it for a limited purpose.  However, the judge later admitted the same e-mail message as a separate exhibit, without limitation, and the department did not object.

The department seeks to downplay these discussions by highlighting the fact that the experts did not explicitly identify electric skin shock in their comments, and argues that they were instead referencing other level three aversives. However, the theme that emerges from all of these communications is a discomfort with banning any specific procedures in that category, which would include electric skin shock, without additional evidence and research. And importantly, when the concerns of these experts were relayed to the department, the department responded by silencing any further debate among the subcommittee as to level three aversives. Indeed, from the outset of the subcommittee's consideration of this topic, the department bluntly informed the co-chair that "it [wouldn't] matter" if the ABA literature supported the efficacy and professional acceptability of specific decelerative procedures when it came to procedures that the commissioner "[did] not like."

There was also evidence that this debate was not isolated to experts consulted by the department. The 2016 edition of the ABA textbook "Contemporary Behavior Therapy (Sixth Edition)," excerpts of which were admitted at trial, states that "mild electric shock often is an effective and efficient means of significantly reducing self-injurious behaviors." Additionally, Dr. Richard Foxx, a national expert in this area, believed that

the use of electric skin shock may be necessary to treat a "very, very small number of exceptional cases where the individual's behavior was so extreme as to be life threatening."[27]

Testimony provided by the plaintiffs about the efficacy of JRC's treatment methods formed another source of evidence that the judge could reasonably consider in assessing this issue. Although the department dismisses this evidence as "anecdotal," the testimony credited by the judge reflects that, for many families with children at JRC, its treatment methods were not only effective, but also considered more humane than the course of restraint and pharmacological sedation to which their children had previously been subjected. One mother testified that, prior to JRC, her daughter had a long history of school expulsions and hospitalizations due to her severe aggressive behaviors. The daughter had previously been prescribed Abilify

---

[27] While not necessary to our analysis, we also note that two separate Federal court cases involving JRC from 2010 and 2012 reference the existence of such a debate within the context of addressing claims brought under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. See Bryant v. New York State Educ. Dep't, 692 F.3d 202, 215 (2d Cir. 2012), cert. denied, 569 U.S. 958 (2013) (referencing "ongoing debate among the experts regarding the advantages and disadvantages of aversive interventions and positive-only methods of behavioral modification"); Alleyne v. New York State Educ. Dep't, 691 F. Supp. 2d 322, 332 (N.D.N.Y. 2010) ("It is readily apparent that the use and benefits of aversives in an educational setting is a divisive issue among educational professionals").

and Risperdal, among upwards of twenty other medications, and had been subject to long periods of seclusion and restraint at prior placements.  All were unsuccessful in treating her violent behaviors.  By the time she enrolled at JRC, it was the only facility in the Commonwealth that was willing to take her.  And in contrast to the prior treatment inventions she had received, JRC's treatment protocol was effective in minimizing her behavioral problems, allowing her to go on field trips and other outings.  As her mother testified, "[My daughter] says her whole world opened up. . . .  She has gone from a person that is isolated and medicated and injured and unhappy to a young person that is happy and able to live in a world and experience what other people experience."  A father testified that his son came to JRC with incredibly harmful behavioral issues, including rectum and throat gouging, eye picking, and self-induced vomiting.  After being placed at JRC and treated with the GED, and in contrast to prior pharmacological treatments, the dangerous behaviors substantially decreased.  The father testified that his son is "happier now than he's ever been" and engages in hobbies and field trips.

A former JRC patient who testified at trial described experiencing a similar journey.  Prior to JRC, she had repeatedly been expelled from residential placements, and had been rejected from as many as thirty-seven programs, due to

extremely violent behaviors that she exhibited toward herself and others. During this time, she was treated with numerous medications, which she testified had the effect of making her feel like a "zombie," and was repeatedly placed in physical restraints, including straightjackets. When she finally came to JRC and began treatment with the GED, her self-injurious behaviors drastically decreased, until they went away completely. She eventually went on to receive her high school diploma, obtained gainful employment, and now has children of her own. These testimonials are also echoed in a description offered by one of the independent clinicians tasked with evaluating JRC treatment plans, in an e-mail message sent to the department's general counsel:

> "Having visited institutions and programs all over the country, and in some foreign countries, I have rarely, if ever, seen clients with the degree of disability seen at JRC dressed in shirts and ties, living in community housing and earning weekends at community recreation, shopping, and dining activities."

To be sure, despite these examples, and as the judge below appropriately recognized, the use of level three aversives remains bitterly contested and controversial, even when it is limited to a class of patients for whom other treatment protocols have failed, and authorized only through substituted judgment proceedings. As the judge acknowledged, JRC stands alone in using electric skin shock to treat such patients, when

other facilities would decline to do so.  And as the department highlights, the National Association of State Directors of Developmental Disabilities Services has rejected the use of electric skin shock, many clinicians regard electric skin shock as a treatment that does not fall within the standard of care, and as the judge found, approximately one-half of States have banned its use on the developmentally disabled.  Nonetheless, we cannot conclude that the judge's finding regarding the use of aversives was clearly erroneous based on the evidentiary record before the Probate Court in 2016.  See Demoulas, 424 Mass. at 510 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" [citation omitted]).

In reaching this conclusion, however, we remain troubled that we do so based on a record that is nearly a decade old. The correspondence between members of the PBS subcommittee in 2012 and 2013 reflects a concern that additional evidence, research, and dialogue would be necessary to achieve a consensus.  Yet, in response to those concerns, the department decided that "it was not appropriate" for the subcommittee to consider the issue further.  We also do not know whether these experts later changed their mind based on additional information, or whether other significant research and treatment developments have taken place since the close of evidence in

2016. And when asked at oral argument whether this case should be remanded for further findings in this regard, the department was adamant that it not be. Thus, we do not reach the propriety of electric skin shock treatment in 2023, as we do not have the record to do so, and we therefore do not foreclose the possibility that new scientific developments or a more recent evidentiary record would suffice to demonstrate a change in the standard of care. See MacDonald, 467 Mass. at 394 ("Although we conclude that the judge here, on this record, did not abuse her discretion in denying the defendant's motion to terminate the abuse prevention order, we leave open the possibility that the defendant might be able to meet his burden if he were to renew his motion with a stronger evidentiary foundation").

c. JRC's implementation of GED. The department contends that, regardless of whether the use of electric skin shock is acceptable as a general matter, its use at JRC is improper because it is not employed solely as the least restrictive method of treatment. The department points to expert testimony and video footage admitted at trial, which shows eleven specific instances in which the GED was applied to seemingly minor behaviors, as proof that "JRC regularly misuses GED."

Importantly, the department does not appear to be arguing that JRC is violating or subverting the authorization provided by its court-approved treatment plans. Rather, the department

principally takes issue with some of the behaviors for which JRC has been granted court approval to use the GED. Yet the department retains the authority to participate in the annual substituted judgment proceedings in which those individual treatment plans are approved. And as we have previously stated, if the department's monitoring of JRC "reveals any problems [in an individual treatment plan], that information should be brought to the judge who has authorized the use of aversive treatments." JRC I, 424 Mass. at 447 n.20. However, as the judge below found, the department regularly declines to do so, despite being given the opportunity to weigh in on a yearly basis, and despite having access to the materials that JRC uses in support of its substituted judgment petitions. See 115 Code Mass. Regs. § 5.14(4)(d)(6) (2011). Given the department's failure to utilize these existing means of preventing any unjustified application of the GED in particular circumstances, we cannot discern why those existing corrective measures are inadequate and why elimination of the consent decree in total is an appropriate remedy. The department can and should raise these specific concerns in the yearly substituted judgment proceedings before the Probate Court.

6. Whether continued enforcement of consent decree violates separation of powers. The department further argues that the decree interferes with the department's regulatory

authority, in violation of the separation of powers expressed in art. 30 of the Massachusetts Declaration of Rights.  We disagree.

This is not the first time that we have considered the relationship between the consent decree and the department's constitutional regulatory authority.  In response to a similar argument raised by the department in JRC I, 424 Mass. at 445, we indicated that "to read the [consent decree] as a delegation of all regulatory authority" would raise constitutional concerns.  However, the consent decree contained no such provision to this effect, and we concluded that it was reconcilable with art. 30.  See id.  In so doing, we distinguished those regulatory powers that the department retains from those actions that must give way to the consent decree and judicial enforcement.  In explaining that distinction, we stated that the department retained "authority regarding certification requirements [and] compliance with applicable regulations," but that the consent decree reserved "the ultimate decision on an individual's treatment" to the judiciary, via substituted judgment.  See id. at 445-446.  We also explained more specifically that the department was precluded from using "bad faith regulatory practices . . . [to] ensure that no individual . . . receive[s] aversive therapies at JRC."  Id. at 449.

We address this "bad faith" regulatory constraint first,
and its relevance to the evidentiary record before the court as
of 2016.[28]  Given the department's history of using its
regulatory power in bad faith to halt the use of physical
aversives and interfere with JRC operations, it was
constitutionally permissible to impose certain restrictions on
regulatory changes by the department that would limit the use of
level three aversives.  This is not a separation of powers
problem.  Rather, the department's own bad faith regulatory
practices (and those of its predecessor) justified imposing
limitations on its regulatory authority, by way of a consent
decree, as a form of remedial action.  See JRC I, 424 Mass. at
461; Matter of McKnight, 406 Mass. 787, 807 (1990) (Liacos,
C.J., dissenting) (general practice of judicial deference to
agency expertise "is not absolute; it gives way in the face of
agency misbehavior").  By agreeing to be bound by the decree,
the department agreed to additional restrictions on its own
ability to regulate level three aversives in any manner that
would exceed the constraints imposed by the consent decree.  The
department also bound itself to the requirement of demonstrating

---

[28] In so doing, we note that we have not been presented with
any allegations or evidence of bad faith since that date and do
not purport to address whether any bad faith conduct has
occurred in the seven years that have elapsed since the close of
evidence.

a change in circumstances before it could escape the constraints contained within the decree.

These constitutionally permissible constraints precluded the regulatory change proposed by the department in the 2011 regulations.  The use of level three aversives was authorized by the Probate Court, pursuant to the substituted judgment process, when it was found to be the least intrusive and most appropriate means of preventing significant harm for an individual patient. The 2011 regulations took that power away from the Probate Court, and thus constituted an impermissible end run around substituted judgment proceedings.  Further, the department was well aware of the existing consent decree at the time it chose to promulgate the 2011 regulations, and yet made no attempt to terminate the decree prior to doing so.  It is not a separation of powers problem to enforce the consent decree and its constraints in this context or to consider the 2011 regulations as another example of bad faith regulatory misconduct.

Nor do we find persuasive the department's contention that a prospective regulatory ban on level three aversives is permissible because it does not interfere with any existing patient's treatment plan or the substituted judgment process overseen by the judiciary.  This is far too narrow a reading of our prior decision in JRC I.  The consent decree's limitation on the regulatory powers of the department, which came about as a

result of the bad faith conduct of the department's predecessor, was not limited to existing JRC patients but extended to the department's supervision over JRC's operations more generally. Nor were these constraints limited to interference with the substituted judgment process in an individual patient's treatment plan.  See JRC I, 424 Mass. at 449 ("it would be absurd to conclude that, although the agreement was intended to settle claims that the department's predecessor was improperly denying the patients needed aversive therapy, the department could, through bad faith regulatory practices, ensure that no individual could receive aversive therapies at JRC").

Thus, the department may not prospectively ban the use of level three aversives for all new patients, in the absence of changed circumstances, without running afoul of the consent decree.  The existence of such a change in circumstances requires a judicial determination to that effect, not a unilateral decision by the department.  If the department could simply pass a new regulation at any point to prospectively ban the use of level three aversives, the consent decree would be a pointless paper tiger, ignoring the department's past misconduct and the resulting consequences.

This does not mean that the department is powerless to prevent the improper use of the GED.  The judge below found that "physical aversive treatment has not been effective for all JRC

students and may not be the least restrictive procedure available to treat every student receiving physical aversive treatment." To the extent that the department agrees that this is the case for any particular patient, it can and should register those objections with the Probate Court. We believe this division of authority is in keeping with JRC I and separation of powers principles.

Finally, we address the department's argument that failing to terminate the consent decree violates the department's statutory mandate. The department is charged with "mak[ing] regulations for the operation" of providers of residential services like JRC, see G. L. c. 19B, § 15 (a), as well as "adopt[ing] regulations . . . which establish procedures and the highest practicable professional standards for the reception, examination, treatment, restraint, transfer and discharge of persons with an intellectual disability in departmental facilities," see G. L. c. 123B, § 2. The statutory scheme requires that this latter type of regulation "be adaptable to changing conditions and to advances in methods of care and treatment and in programs and services for persons with an intellectual disability." Id.

Such a mandate must certainly be respected. Further, we note that the department's ability to pass regulations unrelated to level three aversives is totally unaffected by the consent

decree.  The only issue is whether the department can change regulations related to level three aversives.  In this regard, evidence of changing conditions and advances in methods of care and treatment are critical considerations in assessing whether changed circumstances justify termination of the consent decree and its limitation on the department's regulatory authority. The judge's fact findings, however, reject the conclusion that advances in methods of care and treatment as of the close of evidence in 2016 supported the elimination of level three aversives for these deeply troubled patients.  Rather, the expert testimony from 2015 and 2016, or at least the judge's fact finding regarding that testimony, supported preservation of level three aversives as an option of last resort for this particular group at that time.  We express no opinion whether further medical advances since the hearing, or a better evidentiary record regarding such advances, would justify lifting the consent decree now or in the future.

7.  Existence of changed circumstances of law.  Finally, we address the department's remaining arguments as to changes of law that would warrant termination of the consent decree.  For the reasons discussed infra, the judge did not abuse her discretion in declining to grant relief on this basis.

a.  Change in Federal reimbursement policy for JRC services.  The department highlights that the Centers for

Medicare & Medicaid Services, a division of the Department of Health and Human Services that oversees the Federal administration of Medicaid and Medicare, indicated in 2012 that it would no longer deem JRC's services eligible for reimbursement from its Home and Community-Based Services waiver program.[29] As a result, the Commonwealth has expended additional funds to make up for the shortfall in Federal reimbursement. From 2012 to 2015, this amounted to $7.7 million.

Although the judge did not address this change in Federal policy, her failure to do so was not an abuse of discretion. Even though financial constraints "are a legitimate concern of government defendants," they are normally assessed within the context of "tailoring a consent decree modification," rather than its wholesale termination. Rufo, 502 U.S. at 392-393. This is not to say that financial constraints could not warrant termination, but only that the department has not sought to explain the impact of this funding burden or what strain it has placed on State resources. Without any such information, we are

---

[29] The Home and Community-Based Services (HCBS) waiver is a program that enables States to receive Federal funding for community-based services provided to individuals who would otherwise be institutionalized.

unable to conclude that this is evidence per se to warrant termination of the decree.[30]

b. 2011 regulations. The 2011 regulations, through which the department prospectively sought to ban the use of level three aversives on new patients, do not constitute a change in circumstances either. These regulations were promulgated by the department, a party bound by the decree, and cannot form the basis for permitting the department to escape, extrajudicially, the obligations it voluntarily agreed to assume, for the reasons discussed supra. That much should have been clear from our prior opinion. See JRC I, 424 Mass. at 449 (observing that it would be "absurd" to conclude that department could sidestep obligations under consent decree by resorting to "bad faith regulatory practices" for purpose of "do[ing] indirectly what [the] order makes clear [it] cannot do directly"). See also Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 533 F. Supp. 869, 876 (E.D. Pa.), aff'd, 678 F.2d 470 (3d Cir. 1982) ("A party should not be permitted, however, to obtain a

---

[30] As the department appears to acknowledge in its reply brief, the decision by the Centers for Medicare & Medicaid Services (CMS) to stop reimbursements for JRC services was not competent evidence of a change in the professional standard of care, as the department presented evidence of CMS's decision only for the limited purpose of showing that Federal funding for HCBS waiver participants at JRC had been revoked.

modification of a consent decree because of changed circumstances of its own creation").

By contrast, a legislative ban on the use of electric skin shock would constitute a change in circumstances.[31]  See Rufo, 502 U.S. at 388.  And indeed, it is apparent that, during the relevant period at issue in this case, EOHHS's preferred strategy for changing the Commonwealth's policy toward electric skin shock was a legislative ban.  It was only in 2010, after no legislative solution materialized, that Bigby provided the Governor with other policy options to restrict or eliminate

---

[31] The department and the amici also make reference to a rule promulgated by the Food and Drug Administration (FDA) in 2020 that banned the use of electric shock devices for treatment of severe self-injurious or aggressive behavior.  See 85 Fed. Reg. 13,312 (2020).  This rule -- which was promulgated after the judge issued her decision below -- was later vacated by the United States Court of Appeals for the District of Columbia Circuit as exceeding the FDA's authority.  See Judge Rotenberg Educ. Ctr., Inc. v. United States Food & Drug Admin., 3 F.4th 390, 393 (D.C. Cir. 2021).  We note, however, that in December 2022, Congress amended the statutory language that formed the basis for the District of Columbia Circuit's decision to vacate the rule.  See Pub. L. No. 117-328, § 3306, 136 Stat. 4459, 5834 (2022).  In a letter filed pursuant to Mass. R. A. P. 16 (l), as appearing in 481 Mass. 1628 (2019), the department indicates that the FDA has recently announced its intent to issue a proposed rule that would again ban the use of devices like the GED.  If the FDA does, in fact, promulgate the same rule again, that may well warrant termination of the decree.  See Atlanticare Med. Ctr. v. Division of Med. Assistance, 485 Mass. 233, 247 (2020).  See also Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 388 (1992) ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law").

aversives.  However, Bigby's first instinct was correct -- any change in circumstances cannot be manufactured by way of regulatory changes promulgated by the very agency bound by the decree.

If the department seeks to get out from under the decree, it must either wait for a legislative solution, provide more robust evidence that electric skin shock is outside the standard of care than the record it relied upon in 2016, or establish an ongoing record of good faith regulatory conduct toward JRC.  In the interim, of course, the department is always free to intervene in any individual substituted judgment proceeding where it objects to the use of the GED for a particular patient. Indeed, in the one recent case where the department chose to do so, it prevailed.  The wisdom of the department's decision not to avail itself of this option for any other patient is not before us.

<u>Judgment affirmed</u>.